## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 25-CR-164 (JMC)** |
| | ) | |
| **EMILY SOMMER** | ) | |
| _____ | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Emily Sommer, by her attorney, hereby submits the following memorandum in aid of sentencing in this matter.

Ms. Sommer is a young woman who suffers from significant mental health issues. She generally lives a quiet life, taking care of her dog, taking care of herself, seeking out treatment, and working when she can find work. She grew up surrounded by a loving family. She worked hard in school and even attended college at the University of Southern California. But medical and mental health issues can develop in people from all walks of life and lead to challenges and struggles for anyone.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████ Ms. Sommer struggled with both her medical and mental health diagnoses, but eventually went back to college part time and completed her degree.

Ms. Sommer then moved across the country to be closer to some extended family members. She was excited to live in Washington, D.C. She is an opinionated woman and feels strongly about advocating for the issues that are meaningful to her.

During her time in D.C., Ms. Sommer enjoyed the surrounding area and the culture and activities that are available in the area. Unfortunately, Ms. Sommer also experienced some of the struggles of living in a city. She had a traumatic encounter with law enforcement officer, and, since that time, ███████████████████████ ████████████████████

Ms. Sommer's conduct in this case is a direct product of Ms. Sommer's struggles with mental health ████████████████████████████████████████. Ms. Sommer is not a danger to the community. She is not a violent person. She is a woman, like many others, who struggles daily with stability and managing her physical and mental health. Ms. Sommer is also a victim of the politicized nature of the Department of Justice in this administration. Ms. Sommer's case was charged in federal court on May 21, 2025. She has been detained since June 9, 2025. Since Ms. Sommer was charged, the U.S. Attorney's Office has recognized—as it had in years past—that mental health cases, like Ms. Sommer's, belong in Superior Court where there are more services available to defendants suffering from mental illness. Unfortunately, Ms. Sommer was not afforded that opportunity. Despite the acknowledgement by the prosecutors assigned to this case that the case clearly involved serious mental health issues, senior officials at the U.S. Attorney's Office would only permit Ms. Sommer to plead guilty to all three felony § 111(a) charges.

Counsel for Ms. Sommer can only assume that this wildly disparate treatment is a direct result of the fact that one person Ms. Sommer assaulted was former acting United States Attorney Edward Martin.

The government now asks the Court to compound the disparate treatment displayed in this case and sentence Ms. Sommer to the high end of the sentencing guidelines that they believe are applicable and to a term of three years of supervised release. Such a sentence would result in unwarranted disparity with other similar cases, including many recently transferred to Superior Court following the onslaught of new prosecutions tied to increased federal law enforcement and deployment of National Guard troops in Washington, D.C.

For the reasons that follow, application of the sentencing factors demonstrate a sentence of time-served with no term of supervised release is sufficient and no greater than necessary to achieve the goals of sentencing.

## I.    <u>Legal Standard</u>

The appropriate punishment in every case must be designed to "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The Sentencing Guidelines remain in tension with this principle, and do a particularly poor job of incorporating a person's history and characteristics in the determination

of an appropriate sentence. Indeed, on this point they contradict the law. *See* U.S.S.G. § 5H1.1 *et seq.* (contending that education, vocational skills, employment record, family ties, age, health, and socio-economic status are generally irrelevant to sentencing even though § 3553(a)(1) expressly requires sentencing courts to consider such factors).

It is now "emphatically clear" that the "Guidelines are guidelines—that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). The Court must keep in mind that, as the Department of Justice has also noted, determining the Guidelines range is no substitute for an independent determination of a sentence that is "appropriate [and] serve[s] the interests of justice." *See* Gov't Supp. & Amend. Sent. Mem., *United States v. Stone*, No. 19-cr-18 (ABJ) (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors); *see also Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

As the Supreme Court explained in *Nelson*, "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." 555 U.S. at 352. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* Thus, after evaluating the Guidelines along with the other co-equal sentencing factors set forth

in 18 U.S.C. § 3553(a),[1] a sentencing court may find that the case falls outside the "heartland" contemplated by the Guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. 220, 259-60 (2005). Ultimately, the central mandate of § 3553(a) requires district courts to impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing set forth in § 3553(a)(2).

**II.    <u>The Zero-Point Offender Reduction Should Be Applied.</u>**

Ms. Sommer's actions were not violence and do not exclude her from the application of zero-point offender under § 4C1.1.[2] Importantly, 18 U.S.C. § 111(a) does not criminalize violence, but rather resistance that includes physical contact. Every instance of physical contact is not violent. The video of the interactions between Ms. Sommer and the U.S. Marshals demonstrate that Ms. Sommer was merely resisting. She was not engaged in violence or acting with an intent to injure. She was reacting to the traumatic experience of being forcibly arrested by a group of a dozen U.S. Marshals. After being smashed against the wall, watching the officers

---

[1] These other factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the need to avoid unwarranted sentencing disparities, (4) the need for restitution, and (5) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a).

[2] Probation does not contend that spitting would disqualify Mr. Sommer from § 4C1.1, so only the kicking is addressed here.

remain unlawfully in her apartment despite her protest, thrown violently and forcefully onto the floor of her apartment hallway, and having officers kneel on her spine despite her protests about her significant pain and concerns because of her Ehlers Danlos Syndrome diagnosis, Ms. Sommer continued to resist at various points of her arrest. Ms. Sommer entered a guilty plea to resisting under § 111(a) involving physical contact. But that resisting is not violence and does not disqualify her from the application of § 4C1.1.

The facts in Ms. Sommer's case are distinguishable from other § 111(a) cases where zero-point offender was not applied. *See, e.g., United States v. Williams*, No. 21 Cr. 618 (ABJ), 2024 WL 1239989 (D.D.C. Mar. 22, 2024); *United States v. Bauer*, No. 21-cr-386-2 (TNM) (D.D.C. May 31, 2023) (ECF No. 187); *United States v. Dillard*, No. 23-cr-49 (JMC) (D.D.C.). In those cases, the defendants were part of the mob of individuals who stormed and invaded the United States Capitol on January 6, 2021. Those defendants went to the Capitol to violently riot and did so. The actions of those defendants were coupled with a "fury, vehemence, or outrage" that is distinct from Ms. Sommer's actions. *Williams*, 2024 WL 1239989 at *4. While it is true that Ms. Sommer was shouting at the Marshals at various points and resisting, her actions were a product of PTSD and a mental health crisis, not an intent to cause harm. Her actions were a reaction to the show of force from the Marshals and the treatment she received during her arrest.

Crucially, both with respect to the application of § 4C1.1 and the need to avoid disparities in sentencing, Ms. Sommer's conduct is entirely distinguishable

from *United States v. Dillard*, No. 23-cr-49, where this Court declined to apply
§ 4C1.1. Mr. Dillard was an active participant in the January 6 riot. He marched to
the Capitol, used a metal tool to smash a window, entered the Capitol, and
assaulted two officers. One assault included "grabbing the officer from behind and
throwing the officer backwards onto the marble floor." *United State v. Dillard*, ECF
No. 35 at 2 (government sentencing memorandum). Mr. Dillard then "repeatedly
shoved a second officer away from the doors in an effort to reopen the doors and
allow more rioters to enter." *Id*. These actions were violent. They were undertaken
with a goal to commit violence. Ms. Sommer's acts of resistance were not.

Ms. Sommer's conduct is more squarely in line with *United States v. Yang*, No.
23-cr-100 (JDB), 2024 WL 519962, *4-5 (D.D.C. February 9, 2024), where Judge Bates
applied the two-level reduction because the physical contact of Mr. Yang were "brief
and reactive." *Id*. at *4. For all of these reasons, the reduction in § 4C1.1 should be
applied and the applicable Guidelines range is 8-14 months.[3]

---

[3] Even if the Court does not apply the § 4C1.1 reduction, the Court can vary based
on the statistics that demonstrate individuals with zero criminal history points are
less likely to reoffend. These statistics are not exclusive to individuals who would
otherwise qualify for the § 4C1.1 reduction. Sentencing Commission data analyzing
recidivism rates shows that individuals, like Ms. Sommer, with zero criminal
history points have considerably lower recidivism rates, including lower recidivism
rates than the individuals in Criminal History Category I with one criminal history
point. *See* United States Sentencing Commission, *Recidivism of Federal Offenders
Released in 2010* (Sept. 2021), available at https://www.ussc.gov/sites/default/files/
pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf.
The Commission found that just over one-quarter (26.8%) of individuals with zero
criminal history points were rearrested. *Id*. at 26.  The rearrest rate of zero-point
individuals was significantly lower than individuals with just one criminal history
point, of which 42.3% were rearrested. *Id*.  The variation between individuals with
zero and one criminal history point was the largest variation of any comparison of

III. **Imposing a Sentence of Time Served is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. § 3553(a).**

    **a. Ms. Sommer's Personal History and Characteristics**[4]

Ms. Sommer was born in Minnesota and her family moved to the Los Angeles, California area when she was four years old and around the same time, her parents divorced. From that point forward, Ms. Sommer and her siblings split their time between their parents. While at the time, Ms. Sommer did not think much about moving back and forth between her parents' homes, as an adult she reflects upon that time and wishes she experienced more stability as a child.

As an adult living alone in Washington, D.C., Ms. Sommer struggled at times with her mental health. ███████████████████████████ her dog, Roo, provided necessary affection and companionship.[5] Ms. Sommer's prior mental health court cases demonstrate that she, like many individuals with mental health diagnoses, faces ups and downs. But she successfully completed mental health court each time. The facts surrounding the current pending matters in Superior Court also stem from mental health struggles. The police reports make clear that Ms.

---

offenders within the same Criminal History Category. *Id.* Ms. Sommer's zero criminal history points makes her statistically less likely to reoffend or be rearrested. The low likelihood of rearrest supports a finding that a sentence of time served is sufficient, but not greater than necessary, to provide adequate deterrence and protect the public.

[4] Ms. Sommer will not repeat the history and characteristics described in the introduction above.

[5] Ms. Sommer loves her dog, Roo. During her incarceration, Roo has been in temporary foster care and Ms. Sommer is anxious to be reunited with her. *See* Ex. A, Letter of Lisa Szymanski ("Emily is also a loving and conscientious dog owner and has expressed her gratitude to me for finding wonderful care for her dog, Roo, for these last few months.").

Sommer believed her neighbor was spying on her and reporting her actions to the government. These facts demonstrate that Ms. Sommer is not someone who is willfully and knowingly violating the law. She is someone who was struggling and, instead of being offered treatment and assistance in regaining stability through mental health court, the government demanded Ms. Sommer's incarceration and felony convictions.

During this period of struggle, Ms. Sommer's father passed away from cancer. Ms. Sommer was very close to her father and greatly affected by his death. As the Court will see in the video of Ms. Sommer's arrest, it is this grief and Ms. Sommer's concern that something would happen to her father's ashes that caused her to initially resist and spit on one of the Marshals. *See* Ex. A, Letter of Lisa Szymanski ("She recently lost her father, and the first thing she asked me to remove from her apartment for safekeeping was the urn with his ashes."). She was extremely concerned with their entry into her apartment, especially after she had exited and when she could not see what they were doing.

Although not living in the same city, Ms. Sommer's remaining family, while in no way condoning her actions, continue to support her and are committed to ensuring Ms. Sommer continues with her mental health treatment upon her release. *See* Ex. A, Letter of Janet Sobell ("Ironically, the events of the past few months have brought our family and friends even closer together. We want nothing more for Emily than to be given a chance to begin afresh, with support from family and friends. But the real work is up to Emily. We all believe that she can and will realign her life and become

a contributing member of society."); Letter of Lisa Szymanski ("I have no doubt that Emily regrets her impulsive, immature behavior in this incident. I'm sure that all she wants now is to be reunited with her family, friends, and Roo and to put this ugly chapter behind her. I respectfully ask that you consider the difficulties Emily has faced and the price she has already paid when you determine her sentence."). Ms. Sommer is personally committed treatment and intends to return to the regular treatment that she was receiving ████████████████████ as soon as she is released. ██ ████████████████████████████████████ ████████████████████████████████████

Supervised release is not necessary, in part, because Ms. Sommer already has the resources needed to maintain stability and get mental health treatment.

Ms. Sommer's experience in the D.C. Jail has instilled in her a determination to never be in this position again. She is sincerely remorseful for her actions and accepts responsibility. Her time at the D.C. Jail has been eye opening and traumatic. She was without glasses for months and unable to see clearly for a majority of her incarceration to date. She also was attacked by another individual in her unit and suffered a black eye. Additionally, during her arrest in the Superior Court cases, Ms. Sommer was dropped on the floor of a detention cell and suffered two black eyes and severe bruising on her left side. It took weeks for the bruising to go away. She understands the seriousness of her actions and has no intention of ever being in this situation again.

Mr. Sommer's history and characteristics counsel in favor of a time served sentence and no supervised release. Upon release, she does not need supervised release to connect her with services, because she can restart treatment with her regular care providers on her own.

**b. Nature and Circumstances of the Offense**

Ms. Sommer accepted responsibility for this offense rather than proceeding to a jury trial. Ms. Sommer is embarrassed by her conduct in this case. But the conduct in this case is distinguishable from many other § 111(a) offenses and warrants a time served sentence.

As described by her family, Ms. Sommer is very opinionated and fights for the things she believes in. Unfortunately, Ms. Sommer chose to express her disagreement with Ed Martin and his actions as acting United States Attorney in an inappropriate manner. While there is nothing wrong with expressing disagreement, Ms. Sommer acknowledges that spitting on Ed Martin was an improper and unlawful way to demonstrate her disagreement.

As described above, Ms. Sommer was reacting to the presence of a dozen heavily armed U.S. Marshals outside her door, multiple tasers pointed at her from the first second of her arrest (despite no resistance at this point), including the priming and pointing of a taser by one of the victims in this case, who was wearing a "Medical" vest at the time of the arrest. The conduct of the Marshals during Ms. Sommer's arrest was shocking. First, the excessive presence and calls to use a taser on a petite woman who was not resisting started the encounter in an unnecessary

way. Second, after Ms. Sommer was out of her apartment and secured in U.S. Marshal custody, multiple Marshals, without a warrant or lawful authority, entered her apartment and conducted a visual search. It was not a search for other individuals because the Marshals remained in the apartment looking around for minutes after the arrest and after it was clear no one was present.

This illegal entry and search are what triggered Ms. Sommer to react and spit on the Marshal. It is clear from the video that she was distraught by the possibility that the Marshals in her apartment would disrupt or damage her father's ashes, which were in her apartment. The Marshals could not have cared less. They continued to smash her against the wall and, after she spit, throw her forcefully onto the ground, before multiple Marshals kneeled on her back. This reaction and use of force was not an appropriate response to spitting. Ms. Sommer continued to scream and ask for the Marshals to get off her because she was in pain and suffers from a disease that makes her joints extremely susceptible to dislocation and permanent damage. She was terrified of what potentially permanent damage the continued pressure on her back would cause.

Should Ms. Sommer have continued to resist and struggle against the officers, no, but she was reacting to what she was experiencing in the moment. And she was reacting as a person who suffers from PTSD due to a prior encounter with police.

While her actions are not excused, and Ms. Sommer is not seeking to excuse her actions, they are more fully understood in this context. And when fully understood, it is clear that a sentence of time served with no supervised release is

sufficient but not greater than necessary to account for the nature and circumstances of Ms. Sommer's offense.

### c. A Time Served Sentence Would Provide Adequate Deterrence to Criminal Conduct, Protect the Public from Further Crimes of the Defendant, Promote Respect for the Law, and Provide Just Punishment.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." Ms. Sommer is not a danger to the public and the last four months at the D.C. Jail have provided significant deterrence from any future conduct by Ms. Sommer.

A lengthy sentence does not have the curbing effect on crime that many assume it does. A 2017 Vera Institute of Justice analysis shows that higher levels of incarceration has diminishing returns for society:

> It may seem intuitive that increasing incarceration would further reduce crime: incarceration not only prevents future crimes by taking people who commit crime "out of circulation" (incapacitation), but it also may dissuade people from committing future crimes out of fear of punishment (deterrence). *In reality, however, increasing incarceration rates has a minimal impact on reducing crime and entails significant costs.*[6]

---

[6] Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, July 2017, The Vera Institute of Justice, Vera Evidence Brief, https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf (emphasis added); *see also* Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, Nov. 5, 2018, The Sentencing Project, available at https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/ ("There is also strong criminological evidence that lengthy prison terms are counterproductive for public safety as they result in incarceration of individuals long past the time that they have 'aged out' of the high crime years, thereby diverting resources from more promising crime reduction initiatives.").

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions."). Notably, "the great majority of studies point to a null or criminogenic effect of the prison experience on subsequent offending."[7] Hence, "[t]his reading of the evidence should, at least, caution against wild claims—at times found in "get tough" rhetoric voiced in recent decades—that prisons have special powers to scare offenders straight."[8] Ms. Sommer's experience at the D.C. Jail are sufficiently deterrent. This was her first term of interaction and the time she has spent to date has impressed upon her the significant consequences of her actions.

---

[7] Daniel S. Nagin, Francis T. Cullen, Cheryl Lero Jonson, *Imprisonment and Reoffending*, 38 Crime & Just. 115, 178 (2009).

[8] Nagin, et al., *supra* note 35.

The recommended sentence will also promote respect for the law and provide just punishment. As the Court is aware, there are numerous collateral consequences of a felony conviction, including difficulty finding employment, loss of potential access to federal and state resources, including housing resources, and myriad others. Ms. Sommer, therefore, will be punished with more than just incarceration, but continued stigma of having a felony conviction.

In short, a sentence of more than time served is not needed to deter criminal conduct in this case, protect the public, promote respect for the law, or provide just punishment.

### d. A Time Served Sentence Also Avoids Unwarranted Sentencing Disparities.

The recommended sentence would not create unwanted sentencing disparities.

First, the charging and plea decision made in Ms. Sommer's case is inconsistent with this U.S. Attorney's Office's current position and treatment of similarly situated individuals. Where the government initially charged felony § 111(a), numerous cases have been dismissed from federal court and transferred to Superior Court with misdemeanor charges. Magistrate Judge Faruqui discussed this trend with the Criminal Chief of the U.S. Attorney's Office in a recent status conference. *See* 9/17/2025 Hrg., *United States v. Meath*, No. 25-mj-180 (transcript under seal (ECF No. 11), but audio available to the Court through FTR Gold). The Criminal Chief explained that many of those cases were moved to Superior Court due to mental health issues (issue which were readily apparent to the government in this case) and that it was the Office's position that Superior Court was better suited to

handle such mental health cases. Counsel for Ms. Sommer sought this exact same treatment in her case, but it was not only denied, but the government only offered a plea to three felony offenses. A sentence of time served would prevent any further disparities in treatment between Ms. Sommer's case and other similar cases that have been moved to Superior Court.

Second, a sentence of time served will also not lead to unwarranted disparities in § 111(a) sentences. As discussed above, this case is significantly different from many of the recent § 111(a) cases this Court has experienced, specifically the January 6 cases. In those cases, the defendants stormed the U.S. Capitol and assaulted or resisted officers working to protect the Capitol. Ms. Sommer's actions were her own, not part of a mob or riot, and were impromptu and reactionary. And even in the January 6 cases, courts routinely sentenced below the recommended Guidelines range. *See* Tom Jackman & Spencer S. Hsu, Review of Jan. 6 Cases Finds Judges Give Harsh Lectures, Lighter Sentences, WASH. POST, https://www.washingtonpost.com/dc-md-va/2023/01/06/jan6-capitol-riot-sentencings/ [https://perma.cc/LR3V-4VF9] (Jan. 6, 2023) ("[T]he judges in U.S. District Court in Washington, despite harsh words for the convicted defendants about the historic impact of their actions, have gone below federal prosecutors' sentencing recommendations in more than three-quarters of the cases so far, and below the advisory sentencing guidelines nearly 40 percent of the time."). *See also* Jason Linkins, Most January 6 Defendants Are Getting Light Sentences—and That's OK, THE NEW REPUBLIC (Jan. 8, 2022),

https://newrepublic.com/article/164966/january-6-defendants-sentences-light

("Judges exist to temper [public] emotions and restore balance in the pursuit of justice. It's important to remember that even people whom we disagree with, or don't like, deserve fair treatment under the law."). A below Guidelines sentence is equally appropriate here and would not create any sentencing disparities.

Third, the JSIN for both the government's proposed Guidelines and Ms. Sommer's proposed Guidelines demonstrate that both probation sentences and below Guidelines sentences are not unusual. For the government's proposed Guidelines, 16% receive no incarceration sentence and 49% receive a downward departure or variance. For Ms. Sommer's proposed Guidelines, 21% receive no incarceration sentence and 39% receive a downward departure or variance. A variance to time served would not create any unwarranted sentencing disparities.

A sentence of time served will not create unwarranted sentencing disparities.

## **CONCLUSION**

For the reasons stated above, Ms. Sommer respectfully requests that the Court impose a sentence of time served.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

By:          /s/
Diane Shrewsbury
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500